Timothy Ray FUTRELL, Movant,

v.

**KENTUCKY BAR ASSOCIATION,
Respondent.**

No. 2002–SC–000745–KB.

Supreme Court of Kentucky.

April 20, 2006.

Peter L. Ostermiller, Louisville, Counsel for Movant.

Bruce K. Davis, Executive Director, Linda Gosnell, Chief Bar Counsel, Kentucky Bar Association, Frankfort, Counsel for Respondent.

## OPINION AND ORDER

LAMBERT, Chief Justice.

This matter comes before the Court on the application for reinstatement by Timothy Ray Futrell pursuant to SCR 3.510. The Character and Fitness Committee found that Futrell had failed to show that he presently exhibits good and moral character and that his reinstatement would have an adverse effect on the honesty and integrity of the legal profession. Based on these findings, the Committee unanimously recommended that Futrell's application be denied. The KBA Board of Governors adopted the findings of fact and conclusions of law of the Committee [1] and unanimously concurred in the recommendation to deny Futrell's application for reinstatement. We agree with the Board's recommendation and hereby deny Futrell's application for reinstatement.

Futrell's disciplinary troubles stem from multiple allegations that, in a number of personal injury lawsuits and workers' compensation claims, he misrepresented the amount of settlements to his clients, charged excessive attorney fees, forged client signatures on checks and other legal documents, and converted client funds in his escrow account for his own personal expenses. Disciplinary proceedings were

---

1. Our factual discussion below relies heavily on the findings of fact of the Character and Fitness Committee. While we sometimes incorporate the entirety of those findings, e.g., Hubbard v. Kentucky Bar Ass'n, 66 S.W.3d 684 (Ky.2001), given the length of the findings in this case—well over 30 single-spaced pages—we have opted instead to present a summary of the relevant facts.

initiated against him on December 13, 1989, when the Inquiry Tribunal issued a three-count charge against him alleging that he had engaged in improper conduct as to funds held for a client. The KBA moved to have Futrell temporarily suspended from the practice of law. On January 14, 1991, we issued an order holding Futrell's temporary suspension in abeyance on the condition that (1) he post a cash bond of $100,000 to secure payment for any losses that might have resulted from his misconduct, (2) another attorney act as trustee of the funds, and (3) he not accept any new clients from the date of the order.

In the summer of 1991, Futrell was indicted for the behavior that had given rise to his disciplinary charges and for other criminal conduct. In Christian County, he was indicted for seven counts of Theft by Failure to Make Required Disposition of Property Over $100 and ten counts of Second–Degree Possession of a Forged Instrument—all Class D felonies. In Trigg County, he was indicted on five counts of Theft by Failure to Make Required Disposition of Property Over $100 and seven counts of Second–Degree Possession of a Forged Instrument. He was also indicted for Theft by Failure to Make Required Disposition of Property Over $100 and Possession of a Forged Instrument in Graves County, but these charges were dismissed at trial.

On December 19, 1991, we entered an order noting that additional disciplinary charges had been initiated against Futrell since the entry of the January 1991 abeyance order. In lieu of ordering his temporary suspension as was urged by the KBA, we required him to deposit an additional $48,000 with the trustee.

On December 21, 1993, Futrell was convicted in Christian County of five counts of the felony offense Theft by Failure to Make Required Disposition of Property and three counts of the felony offense Second–Degree Criminal Possession of a Forged Instrument. The trial court sentenced him to 2½ years in prison. This conviction led to his temporary suspension on March 24, 1994.

On May 19, 1997, Futrell moved this court to allow him to resign under terms of disbarment. On September 4, 1997, we granted the motion, thus ending the KBA's inquiry as to five separate KBA disciplinary files that arose out of charges of professional misconduct having to do with the conduct underlying the Christian County charges. As a result, we ordered that Futrell was not permitted to engage in the practice of law in the Commonwealth of Kentucky until such time as we entered an order reinstating his membership in the Kentucky Bar Association and that he was not to file an application for reinstatement for a period of five years from the date of the order. *Futrell v. Kentucky Bar Ass'n,* 950 S.W.2d 480 (Ky.1997).

On December 28, 1998, pursuant to *North Carolina v. Alford,* 394 U.S. 956, 89 S.Ct. 1306, 22 L.Ed.2d 558 (1969), Futrell entered a guilty plea in Trigg County to Misapplication of Entrusted Property, a Class A misdemeanor. As a result of this conviction, we later ordered an additional six-month suspension, to run concurrently with the remainder of the five-year suspension. *Futrell v. Kentucky Bar Ass'n,* 989 S.W.2d 166 (Ky.1999).

Futrell filed his application for reinstatement on September 9, 2002. The matter was referred to the Character and Fitness Committee, which undertook a full investigation, including a formal hearing that took place on November 24–25, 2003 and June 11, 2004. The Committee focused on three issues during the hearing: (1) whether Futrell could show by clear and convincing evidence that he had complied

with every term of the order of suspension; (2) whether he could show by clear and convincing evidence that he presently exhibited good and moral character; and (3) whether he had submitted clear and convincing evidence that his readmission would not have an adverse impact on the honor and integrity of the legal profession.

As part of the factual discussion in its report, the Committee spent considerable time recounting the events that led to Futrell's suspension. In all, the Committee detailed Futrell's relationships with eighteen of his clients, all of whom eventually sued him for malpractice. The conduct underlying several of these suits was the basis for the KBA inquiries that had resulted in his motion to resign and for the criminal charges in Christian County and Trigg County. Most of these allegations involved claims that Futrell misinformed his clients about the amounts of settlements in personal injury cases and workers' compensation claims. Specifically, he understated the amounts recovered. This, in turn, allowed Futrell to keep a larger portion of those settlements for himself. In several of the cases, Futrell claimed that he kept such large portions of the settlements because the clients had agreed to high contingent fees—as much as 60%. In some cases, he even produced documents purporting to evidence such agreements, though his clients claimed not to have seen the documents before or to have entered into the agreements.

Ultimately, the malpractice lawsuits against Futrell were settled. Of the eighteen cases it described in detail, the Committee found that seventeen were "substantially similar to each other." Furthermore, the Committee found "an insufficient basis to distinguish" between the six cases that led to Futrell's criminal convictions and the remaining eleven cases. Perhaps most importantly, the Committee specifically noted that some of Futrell's unethical behavior had occurred as early as 1981. The relevance of this fact is particularly important when considered in the context of Futrell's attempt to explain his behavior.

Futrell claimed that much of his unethical and illegal behavior was due to mental and emotional difficulties he suffered during and immediately following his marriage to Penny Futrell. The marriage lasted from 1986 to 1988. Futrell claimed to suffer from "workaholism," which, in turn, led in part to problems in his marriage. He also claimed that his mental and emotional difficulties put him in a "fog" from which he did not awake until 1990 or 1991. Futrell claimed that it was only at the conclusion of this difficult period that he noticed his escrow account contained a large amount of money for which he could not account, and only then did he realize that he had engaged in unprofessional and negligent conduct. In his appearances before the Committee, however, Futrell claimed that he had no criminal intent during that time, though he did admit to having been "grossly negligent."

Futrell also presented the testimony of a psychiatrist, Dr. Griffin, who had treated him in 1989. Dr. Griffin testified that Futrell had been depressed and obsessive-compulsive, and that his performance as an attorney was impaired as a result.

The Committee also recounted the testimony of several of Futrell's friends and acquaintances in the legal community. His former partner testified positively, stating that Futrell was a diligent, organized, and excellent attorney. Other members of the legal community gave negative testimony. One, a former colleague in the military reserves, testified that Futrell had appeared to be in control of himself during the relevant time period and that Futrell's

conduct was not merely negligence, but the result of a well-planned scheme.

When asked to explain the unprofessional conduct that had occurred prior to his marriage to Penny, Futrell claimed that he had simply withheld additional money for legal fees, and he noted that he had not been convicted for any of those actions. The Committee specifically rejected Futrell's attempt to minimize those instances of conduct, noting:

[T]here is substantial evidence that Mr. Futrell engaged in unacceptable activities from 1981 to 1989 and this wrongdoing cannot be explained in terms of depression caused by a domestic breakup in 1988 of a 1986 marriage. Moreover, while Mr. Futrell has presented evidence by Dr. Griffin that he did not have much energy because of his depression, which made it difficult for him to attend to his legal business, his wrongdoing did not occur because he was negligent in his duties. Instead, the Committee finds that Mr. Futrell engaged in a pattern of conduct for a long period of time with many clients, whereby he lied to his clients and forged documents to cheat them out of money entrusted to him.

Because Futrell repeatedly insisted that he never had any criminal intent, the Committee also recounted much evidence that showed that he had intentionally engaged in the activities that led to his suspension. Specifically, the Committee noted: his high degree of control over every aspect of his legal practice (including not allowing his staff to open incoming mail); the consistency of his former clients' allegations of wrongdoing; that the conduct giving rise to those allegations spanned nine years; that he had amassed approximately $300,000 of client funds in his trust account; his failure to report this money as income to the IRS; his characterization of these funds as "alternative investments";

his use of those funds for personal expenses; and his ability, despite his claim that he was "in a fog," to carry on an active law practice without his colleagues noticing his mounting problems. Based on this evidence, the Committee was "unconvinced that Mr. Futrell could be unaware that his activities, on such a large scale and spanning such a long period of time, were unethical and illegal." The Committee also found that Futrell "knew right from wrong and his explanation that these activities occurred while he was in a 'fog' defies credibility."

The Committee then discussed Futrell's candor with it and other authorities, specifically noting that "[t]he crux of a reinstatement proceeding is that the applicant be completely candid with reviewing authority, and reinstatement is not warranted when an applicant has failed to demonstrate that candor at all times." The Committee was especially concerned with this inquiry, since Futrell has sought admission to the bar of three other states, California, Tennessee, and Massachusetts. On his Massachusetts bar application, Futrell noted that he had been suspended from the practice of law in Kentucky. However, he added, "I suffered health problems in 1988–1989 and—in consultation with my physician—attempted to practice through the problems. I discontinued my practice voluntarily in 1991. I was temporarily suspended in 1993 and disbarred in 1997 for the problems that arose in the 1988–1989 time period." He also claimed that the numerous bar complaints had been filed against him when he "was winding down [his] practice," and he characterized the complaints as "cases involv[ing] disputes over attorneys' fees," though he admitted that the plaintiffs in those cases "made claims of professional negligence, fraud, and consumer violations." He also claimed that "[t]here may

have been one or two counter suits" filed in response to the civil claims pursued by his former clients.

The Committee noted similar self-serving statements in Futrell's California bar application. It also noted the following additional statements from the application: (1) "I resigned from the KY Bar Association after my appeals failed in 1994. However I had voluntarily withdrawn from practice at the end of April, 1991 to attend to my health." (2) "I was a party to various civil proceedings stemming from the period in which I experienced health problems."

The Committee also noted that Futrell's Tennessee bar application included statements and information similar to that in his California application. Futrell personally appeared before the Tennessee Board of Bar Examiners in July 2001, where he testified under oath that he had no criminal intent when he engaged in the conduct that led to his suspension in Kentucky. He repeated various claims, including that he had voluntarily withdrawn from his law practice in 1991 and that he had only committed non-criminal, negligent acts.

On his application for reinstatement to the Kentucky Bar Association, Futrell claimed that his applications for admission to the bars of California, Massachusetts, and Tennessee were all pending. He also noted that he "was a defendant in various civil proceedings stemming from factual circumstances that occurred during the period in which [he] experienced health problems." He also repeated his claim that the bar complaints against him were "cases involv[ing] disputes over attorneys' fees" and that he has "been a party to four countersuits related to the" eighteen civil actions discussed above. He also noted that he "closed [his] law office in April, 1991."

The Committee noted that a number of the statements on Futrell's out-of-state bar applications indicated a lack of candor. His repeated claim that he "voluntarily" withdrew from the practice of law is undercut by the simple fact that his 1991 "withdrawal," that is, his inability to take on new clients, was actually a mandatory condition of an Order of this Court. In fact, it was one of three conditions that allowed Futrell to avoid complete suspension from the practice of law. His omission of the word "voluntarily" when describing the situation in his application for reinstatement to the Kentucky Bar Association shows that he recognized this obvious distinction. And though he admitted that his former clients had leveled charges of professional misconduct, he insisted on characterizing the disputes as being over attorney fees. He pressed this claim despite the fact that he testified before the Committee that he had engaged in conduct that was wrongful and inappropriate, and that consisted of misrepresentations about sums of money, failures to pay full sums owed to clients despite a lack of authority to retain extra money from settlements. The Committee also noted that Futrell insisted that the suits brought by his former clients stemmed from his conduct while experiencing health and marital problems in the late 1980s. In fact, several of those suits actually involved conduct that occurred as early as 1981, before his marriage to Penny Futrell and before his claimed health problems arose. The Committee also noted that despite Futrell's claims on his applications that he had been a party in "one or two" or "four" countersuits against his former clients, he had actually filed *eleven* such countersuits.

The Committee also noted other inconsistencies between Futrell's various applications, his testimony, and the other evidence that was considered. Among these inconsistencies were varying representa-

tions as to several key facts, including his alleged reasons for leaving the practice of law and for maintaining advertising in the Yellow Pages, his psychiatric history, the status of his various bar applications, and the biographical sketch used by his subsequent employer. The Committee concluded its discussion in this area by "find[ing] the foregoing evidence to be glaring and unacceptable examples of the evasiveness in answering direct questions, inconsistency in statements, and lack of candor, both by omission and by direct misrepresentation, throughout the testimony presented and the documentation reviewed in connection with Mr. Futrell's application for readmission to the bar."

The Committee also raised serious concerns about Futrell's business dealings, questioning the appropriateness of his attempts to obtain controlling interests in a pair of federally insured banks. The Committee concluded that Futrell's ownership of more than 10% of the outstanding shares of those banks and his exercise of the voting rights related to those shares *after* his felony convictions was a violation of the Federal Deposit Insurance Corporation Act. The Committee also noted evidence that Futrell had appeared to have threatened to file a bar complaint against an attorney who had represented him previously in dealing with the banks, because the attorney was not acting in accord with Futrell's wishes and had begun representing the banks. The Committee concluded that Futrell's threat to file the bar complaint was in violation of SCR 3.130–3.4(f) because it was made in an effort to gain an advantage in negotiations.

The Committee also noted that an important consideration in reinstatement applications was whether the applicant recognized "the wrongfulness of his professional and criminal misconduct, as expressed through verbal and nonverbal indications of remorse or regret, or his sense of 'wrongdoing.'" It then noted that while Futrell had recognized that he had "made mistakes, his statements are, at best, ambiguous about what he admits he did, the nature of his mistakes, whether his actions were wrong, and whether his actions were intentional." Specifically, the Committee noted that Futrell continually dismissed his misconduct as a product of his "workaholism," his mental and emotional problems arising out of his marriage to and divorce from Penny Futrell, and his inability to control his actions. He also blamed other people and institutions for his behavior, including his ex-wife for his "downfall"; his former attorney, David Broderick, for the countersuits against his clients (even though Futrell himself signed the complaints); his law school, since it had not required a legal ethics course; and the Tennessee Board of Bar Examiners for failing to ask questions that would have forced him to clarify any inconsistencies and ambiguities in his testimony. The Committee concluded that

> Mr. Futrell's attempts to re-characterize his original misconduct, to diminish the seriousness of it, and to distance himself from responsibility for it are unacceptable .... In direct questioning by the Committee, he not only refused to acknowledge his intent, he refused to *even admit that his actions crossed the line!* . . .
>
> While Mr. Futrell has said[,] "I make a bad mark on the legal profession ... and these cases are an embarrassment to me in the main, and an embarrassment to the Bench and Bar," the Committee finds that, based on the record and testimony set out above, he has failed to show that he has accepted personal responsibility for, and that he has a full and true appreciation of his mistakes. The Kentucky Supreme Court has consistently held that an applicant

for reinstatement to the practice of law is not required to admit guilt for a criminal offense, but should at least have a sense of wrongdoing and realize the seriousness of the prior conduct.

(Emphasis and third ellipsis in original.)

The Committee next discussed whether Futrell had been rehabilitated. The Committee commended him for continuing his education. He obtained an LL.M. from Boston University, an M.P.A. from Harvard's Kennedy School of Government, and had completed the coursework for a Ph.D. from Northwestern University. The Committee also noted that following his release from prison, Futrell worked for a nonprofit corporation for three years. Several witnesses also testified that he had become more relaxed, had "mellow[ed]," and was honest.

However, several other witnesses testified that he had not been rehabilitated. Employees of the Clerk's office stated that he was arrogant, that he had tried to file a substandard deed, that he regularly argued until he got his way, and that he had tried to intimidate them. Other witnesses testified that Futrell was obnoxious, intimidating, and resorted to threats of litigation in his real estate dealings. His parole officer testified that he had not changed since 1990.

Recognizing that the testimony as to his education and character amounted to a wash, the Committee chose to look more closely at other rehabilitation factors. They specifically noted a voicemail he had left for his former attorney wherein he stated, "Obviously I've had so much junk thrown at me, I've sort of got to make some cosmetic changes in order to appear to be rehabilitated." Obviously concerned that a statement of this sort undercut any appearance of rehabilitation, the Committee asked Futrell for an explanation as to its meaning. He responded that he did not recall making it, that he "would basically be spending the rest of [his] life trying to seek redemption for the period of time in [his] life that [he] was unable to control" and that it had been "just lawyer-like language."

The Committee concluded that the "evidence, when viewed in its totality, indicates that Mr. Futrell's recent conduct has not been exemplary and he has not shown the level of rehabilitation necessary for readmission to the bar."

Finally, The Committee considered whether Futrell's readmission would bring the bar into disrespect and disrepute. The Committee noted that "the most convincing testimony offered on this issue came from those who have close ties to the communities where [Futrell's prior bad] conduct occurred and people in the legal community. A significant number of these individuals believe that his reinstatement would not be well received." The Committee then noted that in this area the testimony of Futrell's supporters, who consisted largely of close personal friends and business associates, was particularly unconvincing.

Based on these foregoing facts, the Committee concluded that Futrell had complied with the terms of his suspension, meaning that he could proceed with his application for reinstatement. However, the Committee further concluded that Futrell had not made a sufficient showing that he presently possesses good and moral character or that his readmission to the bar would not have an adverse impact on the honor and integrity of the legal profession.

Futrell has filed an extensive brief in response to the Committee's findings and conclusions, as adopted by the KBA Board of Governors. His brief consists primarily of a narrative description of the events

that he claims led to his misconduct, as well as a lengthy discussion of his activities since his misconduct. He argues that the Committee's emphasis on his prior misconduct (the discussion of which occupies approximately half of the Committee's findings) is misplaced, since the relevant inquiry at this stage is whether he is sufficiently rehabilitated.

We agree that "the nature of the misconduct leading to disbarment ... is *not* the most significant in determining whether an attorney should be reinstated. The 'fact that one has transgressed does not forever place him beyond the pale of respectability.'" *Greene v. Kentucky Bar Ass'n*, 904 S.W.2d 233, 235 (Ky.1995) (quoting *In re May*, 249 S.W.2d 798 (Ky. 1952)). But as we have repeatedly noted, the fact of disbarment continues to be evidence against an applicant for readmission and that fact may only be overcome by most persuasive proof. *In re Weaks*, 407 S.W.2d 408, 409 (Ky.1966); *In re Stump*, 272 Ky. 593, 114 S.W.2d 1094 (1938). Thus, it is natural and proper for the Committee to discuss, even in detail, an applicant's prior misconduct.

This is precisely what the Committee did in this case. And while the Committee did engage in an extended discussion of Futrell's prior misconduct, we do not conclude that it was the most significant factor in their analysis. Rather, the Committee's findings of fact and conclusions of law focus most on whether Futrell presently has good and moral character, i.e., whether he has rehabilitated himself.

At its most basic level, the reinstatement inquiry involves looking into an applicant's "conception of the serious nature of his act and his previous and, what is of more importance, his subsequent conduct and attitude toward the courts and the practice." *In re Stump*, 272 Ky. 593, 114 S.W.2d 1094, 1097 (1938). Futrell is correct that we have held that in making such a showing an applicant is not required to "humble himself or ... to confess guilt of what may be a criminal offense." *Id.* However, we do note that, unlike the conduct in *Stump*, Futrell's criminal convictions have already conclusively shown his conduct to have been criminal.

We need not dwell on this particular point, however, because, much like the applicant in *In re Cohen*, Futrell "does not admit the serious nature of his unethical conduct ...." *In re Cohen*, 706 S.W.2d 832, 834 (Ky.1986). For example, he has repeatedly minimized the nature of his conduct by referring to it as merely part of a dispute with his former clients over his attorney fees. And when pressed on this point while testifying, he has admitted at most that his conduct was "grossly negligent." Moreover, Futrell repeatedly blamed other persons and entities for his behavior. Such responses, while hinting at the possibility that the prior conduct was, in fact, misconduct, simply do not constitute an acceptance of that fact. Thus, we agree with the Committee that Futrell's responses fail to admit the gravity of his misconduct or even to "manifest a sense of wrongdoing...." *In re Stump*, 114 S.W.2d at 1097.

Even more troubling, however, is evidence suggesting that even Futrell's limited concessions of wrongdoing may only be "cosmetic" and are not substantive acknowledgements of his responsibility. The repeated inconsistencies in Futrell's description of his prior misconduct weigh heavily in this area. Notably, his characterization of his conduct always seems carefully tailored to the circumstances in which it is provided. For example, in his applications for admission to the bars of three other states, he limits his discussion of his prior misconduct to a vague descrip-

tion of the subsequent legal actions brought by his former clients. Yet, when giving live testimony, e.g., before the Tennessee Board of Bar Examiners and our own Committee, and when presented with evidence of the seriousness of his prior misconduct, he is willing to admit to negligence or gross negligence. These inconsistent and obviously tailored responses, especially when combined with his own statement that he has "sort of got to make some cosmetic changes in order to appear to be rehabilitated," evidence Futrell's lack of substantive recognition of wrongdoing.

 While Futrell's brief musters, in great detail, the evidence that supports his contention of rehabilitation, it is not enough to outweigh the evidence discussed above. Ultimately, our inquiry comes down to the following:

> In short, if the disbarred attorney can prove after the expiration of a reasonable length of time that he appreciates the significance of his derelictions; has lived a consistent life of probity and integrity, and shows that he possesses that good character necessary to guarantee uprightness and honor in his professional dealings and the faithful discharge of his duties as a lawyer, and therefore is worthy to be restored, the court will so order.

*In re Stump*, 114 S.W.2d at 1097. In approaching this question, we must also remember that "a higher character of conduct is required of a disbarred attorney than of an original applicant." *In re Applewhite*, 401 S.W.2d 757, 758 (Ky.1965). Simply put, Futrell's lack of candor, the inconsistencies and omissions in his sworn statements, and his unwillingness to concede that he engaged in wrongdoing or even to show any remorse for his actions all point to a lack of rehabilitation. Admittedly, Futrell has not returned to the depths of the wrongdoing that plagued him in the 1980s, and there is some, one might even say substantial, evidence that he has taken steps *toward* rehabilitation. But Futrell bears the burden of "demonstrate[ing] by clear and convincing evidence his [ ] suitability for reinstatement." SCR 3.330; *see also* SCR 3.505(4) ("The burden of proof of one's good character and fitness to practice law shall be on the Applicant."). Given this high burden of proof, and the facts discussed herein, we conclude that Futrell has failed to demonstrate that his "conduct and character since disbarment ... show that he is worthy to have public confidence and trust placed in him." *In re Cohen*, 706 S.W.2d 832, 834 (Ky.1986).

For the foregoing reasons, the recommendation of the Board of Governors is accepted and Futrell's application for reinstatement is DENIED.

COOPER, ROACH, SCOTT and WINTERSHEIMER, JJ.; and MARVIN LEE WILSON and P. RICHARD ANDERSON, JR., Special Justices, concur.